**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA<br>ex rel. Madelyn Rappaport, who brings<br>this action as qui tam Plaintiff; | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) | CASE NO. CV 96-N-1491-S-(A) |
| | ) | |
| HOSPITAL CORPORATION OF<br>AMERICA, a Tennessee Corporation;<br>COLUMBIA/HCA HEALTHCARE<br>CORPORATION, a Tennessee<br>Corporation; HCA MANAGEMENT<br>COMPANY, INC., a Delaware<br>Corporation; HCA MANAGEMENT<br>GROUP, INC., a Delaware Corporation;<br>HSP, INC., a Delaware Corporation;<br>HCA HEALTH SERVICES OF<br>LOUISIANA, domiciled in New Orleans,<br>Louisiana; HCA NORTH MONROE<br>HOSPITAL, a Louisiana Corporation;<br>COLUMBIA/NORTH MONROE<br>HOSPITAL, a Louisiana Corporation;<br>HEALTH TRUST, INC. - THE<br>HOSPITAL COMPANY, a Delaware<br>Corporation; A; B; C; D; E; F; G; H; I;<br>J; K; and L; who are the correct names<br>of the Defendants and whose correct<br>names are otherwise unknown after<br>diligent inquiry but whose correct names<br>will be substituted by amendment once<br>ascertained; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |

FILED
99 JUL -9 PM 3:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED
DEC 1 4 2000
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA** ) | |
| **ex rel. Madelyn Rappaport, who brings** ) | |
| **this action as qui tam Plaintiff;** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CASE NO. CV 96-N-1491-S-(A)** |
| ) | |
| **HOSPITAL CORPORATION OF** ) | |
| **AMERICA, a Tennessee Corporation;** ) | |
| **COLUMBIA/HCA HEALTHCARE** ) | |
| **CORPORATION, a Tennessee** ) | |
| **Corporation; HCA MANAGEMENT** ) | |
| **COMPANY, INC., a Delaware** ) | |
| **Corporation; HCA MANAGEMENT** ) | |
| **GROUP, INC., a Delaware Corporation;** ) | |
| **HSP, INC., a Delaware Corporation;** ) | |
| **HCA HEALTH SERVICES OF** ) | |
| **LOUISIANA, domiciled in New Orleans,** ) | |
| **Louisiana; HCA NORTH MONROE** ) | |
| **HOSPITAL, a Louisiana Corporation;** ) | |
| **COLUMBIA/NORTH MONROE** ) | |
| **HOSPITAL, a Louisiana Corporation;** ) | |
| **HEALTH TRUST, INC. - THE** ) | |
| **HOSPITAL COMPANY, a Delaware** ) | |
| **Corporation; A; B; C; D; E; F; G; H; I;** ) | |
| **J; K; and L; who are the correct names** ) | |
| **of the Defendants and whose correct** ) | |
| **names are otherwise unknown after** ) | |
| **diligent inquiry but whose correct names** ) | |
| **will be substituted by amendment once** ) | |
| **ascertained;** ) | |
| ) | |
| **Defendants,** ) | |

## ~~SEALED~~ COMPLAINT WITH DEMAND FOR JURY TRIAL

     1.    Madelyn Rappaport, R. N.  (hereinafter as Mrs. Rappaport) brings this

action for herself and for the United States of American suing in the name of the United

States of America as qui tam plaintiffs under the False Claims Act found at 31 U.S.C.A.

sections 3729-3733 to recover against **HOSPITAL CORPORATION OF AMERICA,** a Tennessee Corporation; **COLUMBIA/HCA HEALTHCARE CORPORATION,** a Tennessee Corporation; **HCA MANAGEMENT GROUP, INC.,** a Delaware Corporation; **HSP, INC.,** a Delaware Corporation;  **HCA NORTH MONROE HOSPITAL,** a Louisiana Corporation; **COLUMBIA/NORTH MONROE HOSPITAL,** an Arkansas not for profit Corporation; **HCA HEALTH SERVICES OF LOUSIANA,** domiciled in New Orleans, Louisiana; **HEALTH TRUST, INC. - THE HOSPITAL COMPANY,** a Delaware Corporation; A; B; C; D; E; F; G; H; I; J; K;  and L for filing false reports with the Department of Public Health and Human Services, Medicare, various Medicare intermediaries, and/or The Health Care Financing Administration (HCFA), Champus Programs and/or Champva Programs.  A; B; C; D; E; F; G; H; I; J; K;  and L who are the correct names of the Defendants and whose correct names are unknown after diligent inquiry but whose correct names will be substituted by amendment once ascertained.

The Defendants are all subsidiaries, successors, predecessors or affiliates of HCA, Quorum and/or Columbia.  **COLUMBIA/HCA HEALTHCARE CORPORATION** was formed as a result of a merger of the various HCA and/or Quorum entities with Columbia Health Services.  Hereinafter the Defendants named or attempted to be named under this paragraph 1 shall collectively be referred to as HCA.

2.      During the period of time covered by this complaint HCA has owned and/or managed a chain of hospitals extending throughout the United States.  HCA is transaction in the Northern District of Alabama.  It specifically owns and/or operates a hospital in Huntsville, Alabama and in Gadsden, Alabama.

Helena Regional Medical Center is located in and transacts business in Helena, Arkansas and is operated by Helena Hospital Association.  Quorum Health Resources, Inc. assumed the management of Helena Regional Medical Center on or about October 15, 1990.  From approximately October of 1980 through October of 1990 HCA Management Company, Inc. managed the Helena hospital.

Delta Memorial Hospital is located in and transacts business in Dumas, Arkansas. During the period of time covered by this complaint it was and still is managed by the various Quorum and/or HCA entities.

HCA North Monroe Hospital is a Louisiana Corporation transacting business in Monroe, Louisiana.  HCA North Monroe is owned and/or operated by HCA.

Columbia/North Monroe Hospital  is Louisiana Corporation transaction business in Monroe, Louisiana/  HCA North Monroe is owned and/or operated by HCA (which term includes Columbia).

3.    Madelyn Rappaport is an individual person past the age of majority, of sound mind and is a citizen and resident of the State of Louisiana.

4.    The incidents which are made the basis of this action are believed to have occurred in various states in the United States of America over the past ten years where the Defendants do

business and in particular but not limited to Arkansas, Alabama and Louisiana.

5.   The United District Court for the Northern District of Alabama has jurisdiction of this action Pursuant to 31 U. S. C. A. section 3732  since at least one of said defendants can be found  in or transacts business in said judicial district.

6.   The reqirements of 28 U.S.C.A. section 1332 as amended on November 19, 1988 by P.L. 100-702 are satisfied because the amount in controversy exclusive of interest and cost exceeds the sum of $50,000.00.

## FACTS

### RELEVANT MEDICARE BILLING RULES AND REGULATION

### Professional and Technical Components Under Parts A and B

7.   For Medicare billing purposes there  is  generally  the technical component (hereinafter "t") and professional component (hereinafter "p").  The "t" is for non-physician services such as, drawing blood, use of an operating room, daily occupancy rate, or taking an x-ray. The "p" is for physician services such as,  a pathologist's interpretation of a test performed on the blood,  surgery performed on the patient or  a radiologist's

interpretation of an x-ray.   Since a hospital is not a physician it cannot bill for a "p" unless it has a doctor  in its employ or has contracted with a doctor to bill for his "p" when he performs a physician service.  However, a doctor may bill for a "t" if, for example, he took the x-ray on his equipment or his nurse drew the blood.

8.   Physicians bill for their services (both "t" and "p") under Medicare Part B.  Hospitals  bill  their  services  for inpatients under Medicare Part A.  Hospitals bill for their services for outpatients under Medicare Part B.  The amount to be received under Part B is 80% of a predetermined amount allowed by Medicare for the service whether "t" or "p".  The amount  to be received under Part A is an amount predetermined by Medicare based on the patient's diagnosis. This is the DRG system or Prospective Payment System (PPS).  For example, a hospital will receive a specific dollar amount for a Medicare patient who spends time in the hospital for a gall bladder operation.  That is to say,  the DRG for a gall bladder operation pays the hospital, for example $4,500.00.  The hospital receives this amount no matter how much or how little it spends on that patient.  However physician services are billed under Part B.

9.   HCFA employees have indicated that prior to 1991 or 1992 there was no computer interlink between hospital billings and physician billings.  Therefore if there is double billing by

a doctor and hospital for the same "p" Medicare would not catch it.

10.  Section 496.7 of the Medicare Hospital Manual  states that once a hospital qualifies to receive payment for the services of a physician  the reassigned claims  submitted by the hospital for the services of the physician will be honored.


### Special Treatment of Hospitals With High Percentage of ESRD Discharges

11.  Effective October 1, 1984 Medicare provides an additional payment for hospital inpatient dialysis provided to ESRD patients if ESRD  discharges, excluding discharges classified  into DRG No. 302 (Kidney Transplant), DRG No. 316 (Renal Failure), or DRG No. 317  (Admit For Renal Dialysis), constitute 10% or more of the total Medicare discharges. The additional payment is for every ESRD discharge except those which are excluded.  See section 412.104 of the Medicare and Medicaid Guide.

12.  The payment  equals the average length of stay of the ESRD patient expressed as a ratio to one week, times the estimated weekly cost of dialysis for ESRD patients  multiplied by the number of ESRD discharges except those which are excluded. See section 412.104(b) of the Medicare and Medicaid Guide.

13. Padding the Part A bill would enhance a hospital's income if it were handling a disproportionate share of ESRD patients.

## Outliers

14. Medicare will pay amounts for Part A patients (inpatients) in addition to the DRG amount. This is for patients with extremely long lengths of stay or extraordinarily high cost when compared to most discharges classified in the same DRG. These are Outliers.

15. Padding the Part A bill would enhance the cost outlier payment due the hospital.

## Special Treatment For Sole Community Hospitals (SCH)

16. Depending on size and other criteria a SCH is a hospital located between 15 and 35 miles from other like hospitals. See section 412.92 and 4260 of the Medicare and Medicaid Guide.

17. A SCH is paid the greater of (A) the Federal DRG rate or (B) the hospital's specific rate based on FY 1982 costs per discharge or (C) the hospital's specific rate based on FY 1987 costs per discharge. See sections 4260, 412.92(d),

412.70(c)(6), 412.75 and 412.73 of the Medicare and Medicaid Guide.

18.  It appears that padding the Part A bill would enhance Medicare income for a SCH.

**Special Treatment For Medicare Dependent Small Rural Hospitals**

19.  A hospital qualifies as a Medicare Dependent Small Rural Hospital if: (A) It is located in a rural area. (B) It has less than 100 beds. (C) It is not qualified as a SCH. (D)  During FY 1987 not less than 60% of its inpatient discharges were Medicare Part A patients.  See the Medicare and Medicaid Guide, section 4260 and 412.108(a).

20.  A small rural hospital is paid for inpatient operating cost the greater of: (A) the Federal DRG rate or (B)  the hospital's specific rate based on FY 1982 costs per discharge  or (C) the hospital's specific rate based on FY 1987 costs  per discharge.  See  the Medicare and Medicaid Guide, sections 4260, 412.108(c), 412.75 and 412.73.

21.  It appears that padding the Part A bill would enhance Medicare income for a small rural hospital.

**Special Treatment: Essential Access Community Hospitals (EACH's)**

22.  For payment purposes HCFA treats as a SCH any hospital that it designates as an EACH.  Under the regulations a full service hospital in a rural area will be designated as an EACH if it has 75 beds or more or is at least 35 miles from any other hospital and meets other criteria.  A hospital with less than 75 beds may qualify if it is more that 35 miles from the nearest 75 bed hospital.  See  the Medicare and Medicaid Guide, section 4260 and 412.109.

23.  The EACH may receive an increase to the hospital specific rate if it experiences an increase in its Medicare inpatient operating cost  attributable to its membership in a rural health network.  See  the Medicare and Medicaid Guide, section 412.109(d).

24.  Padding the Part A bill could enhance an EACH's medicare income.


**Before October 1, 1991 Capital Related Cost And An Allowance**
**For Return On Equity is Paid On A Reasonable Cost Basis**


25.  From  the Medicare and Medicaid Guide, section 412.2 (e and f) it is clear that prior to October 1, 1991 capital ralated

cost and a return on equity are excluded from the DRG amount and are paid on a reasonable cost basis.

26. Starting on October 1, 1991 payments for capital related cost will be phased into the PPS at the rate of 10% per year for ten years. For example during the first year it will be paid 90% based on reasonable cost and 10% under PPS. See the Medicare and Medicaid Guide, section 412.340. Hospitals with costs above the national average have their old costs protected during the ten year transition period by being able to receive payments at 85% of the reasonable costs for the old capital. See the Medicare and Medicaid Guide, section 4367 and 412.344.

**Apportionment Between Medicare Patients And Non-Medicare Patients**

27. The cost of services to non-Medicare patients will not be borne by the Medicare program and vice versa. There are two methods of apportionment between Medicare and non-Medicare patients, the departmental method and the combination method. See the Medicare and Medicaid Guide, sections 6220 and 6222.

28. The Departmental Method works as follows: The ratio of Medicare patient charges to total patient charges for the services of each ancillary department is applied to the cost of the department. Added to this is the cost of routine services and special care services (such as intensive care) for Medicare

11

beneficiaries determined by a ratio of the  total Medicare inpatient days to the total inpatient days.  The combination methods works in a similar fashion using ratios based on patient charges and patient days.  See the Medicare and Medicaid Guide, section 6222 and exhibit 220, section 2200.1.

29.  Patient charges are used to apportion certain capital related cost.  When patient charges are used, padding the Part A bill would enhance the Medicare payment  for capital related costs.   Routine services are defined at section 2202.6 of the Medicare Provider Reimbursement Manual as room and board charges.

30.  Outpatient services are apportioned on a basis of total Medicare outpatient charges to total outpatient charges.  See Medicare Provider Reimbursement Manual, section 2210.   Padding the Part B bill would enhance payment under Part B.

31.  An analysis of the Helena Hospital's cost reports indicates that Increased charges for Medicare patients would increase the Hospital's reimbursement  for both pass through costs and Part B costs.  The bulk of the increase in the pass through reimbursement would be for the Hospital's capital cost in ancillary services.  There would also be an increase in the pass through reimbursement  for services of CRNA's.  About 80% of the increased reimbursement  would come from increased reimbursement for Part B services.  The majority of Part B services are for hospital outpatients.

32.  Medicare reimbursement for outpatient services has changed over the past nine years.  At the beginning all outpatient services (except for clinical laboratory) were reimbursed on a cost basis using a ratio of cost to charges.

33.  In 1988, Medicare began reimbursing hospitals for Ambulatory Surgical Center services at the lower of cost or a blended rate consisting of a mix of a fee schedule or the hospital's cost.  This method of reimbursement was also used for reimbursing outpatient radiology services in 1988 and for other diagnostic procedures in 1989.  If the hospital's cost is less than the blended amount it will be reimbursed on a cost basis and padding charges would increase reimbursement.  During subsequent years when reimbursement was based solely on the blended amount padding of charges would still affect reimbursement to the extent that costs are included in the blended rate.  Padding drug and supply charges would increase Medicare reimbursement for both pass through costs and for Part B costs.

**Medicare Reimburse for Bad Debts of Medicare Beneficiaries**

34.  In addition to DRG payments Medicare reimburses for bad debts attributable to deductible and coinsurance amounts due from medicare beneficiaries.  See the Medicare and Medicaid Guide, sections 412.115 and 412.2(f).

13

### Hospitals Excluded From PPS Or The DRG System

35.  The following hospitals are excluded from PPS or the DRG system: (A) psychiatric, (B) rehabilitation, (C) cancer, (D) alcohol/drug and   (E)   those in U. S. Territories.  See   the Medicare and Medicaid Guide, section 4213.

### Psychiatric Hospitals Are Excluded From PPS Or The DRG System

36.  Psychiatric hospitals and  distinctive part psychiatric units  are excluded from PPS if they meet the requirements of 42 CFR 412.32.  See  the Medicare and Medicaid Guide, sections 4213 and 412.23.  This would mean that they would be reimbursed on a cost basis.   See   the Medicare and Medicaid Guide,  section 412.22.  In order that a distinct part psychiatric unit be excluded from PPS it must have written admission criteria that are  applied  uniformly   to  both  Medicare  and  non-Medicare patients.  See  the Medicare and Medicaid Guide, section 412.25. There are also other requirements which it must meet.  See  the Medicare and Medicaid Guide, section 412.27 and 412.25.  Padding the Medicare patient bills would enhance payments to psychiatric hospitals.

14

## Attestation

37.   The   attending   psysician   must   shortly   before,   at,   or shortly after discharge (but before a claim is submitted) attest to  the  principal  diagnosis,  secondary  diagnosis,  and  names  of major procedures performed.   The attestation must be in writing, in  the  medical  record  and  signed  by  the  physician  either  in person  or  electronically   if  approved  by  the  intermediary.    The following statement must preceed the physician's signature:

> "I certify that the narrative descriptions of the
> principal  and  secondary  diagnoses   and  the  major
> procedures performed are accurate and complete to the
> best of my knowledge. "

38.   The hospital must have on file an acknowledgment from the physician stating that anyone who misrepresents, falsifies, or  conceals   information  required  for  payment  of  Federal  funds may  be  subject  to  fine   imprisonment  or  civil  penalty.    See  the Medicare and Medicaid Guide, section 412.46.

## Home Health Agencies (HHA)

39.  It is believed that HHA's are paid on a cost basis and that visits in patient homes are reimbursed on a per diem/cost basis.   It is reasonably certain that HHA's are not part of PPS and are cost based.

### Kickbacks, Bribes and Rebates

40.   Effective December 5, 1980 whoever solicits or receives any remuneration directly or indirectly in cash or in kind in return for: (A) referring an individual to a person for furnishing any item of service for which pay is to be made in whole or part by Medicare or Medicaid, or (B) purchasing, ordering, or leasing any good, facility, service or item for which payment is to be made in whole or part by Medicare or Medicaid is guilty of a felony and may be fined up to $25,000.00 and/or imprisoned up to 5 years.  See the Medicare and Medicaid Guide, section 13,915 at pages 5630-5631.

41.   Effective December 5, 1980 whoever offers or pays any remuneration directly or indirectly in cash or in kind to any person to induce someone:  (A) to refer an individual to a person for furnishing or arranging for the furnishing of any item of service for which pay is to be made in whole or part by Medicare or Medicaid, or (B) to purchase, order, or lease any goods, facility, service or item for which payment is to be made in whole or part by Medicare or Medicaid is guilty of a felony and may be fined up to $25,000.00 and/or imprisoned up to 5 years.  See the Medicare and Medicaid Guide, section 13,915 at pages 5630-5631.

42. Violators may be excluded from the Medicare program. See the Medicare and Medicaid Guide, section 13,915 at pages 5635.

43. Hospital incentive programs used to compensate physicians (directly and indirectly) for referring patients to the hospital are implicated by the anti-kickback statute and they are not protected by the "safe harbor" regulations. Some examples of questionable practices which may be subject to prosecution are: (A) Payment of any incentive each time a physician refers a patient to a hospital. (B) The use of free or discounted office space or equipment. (C) Provision of free or significantly discounted billing, nursing or other staff services. (D) Gurantees of physician income levels. (E) Payment of cost for conferences or continuing education. (F) Payment for services which require few if any substantive duties by the physician. See the Medicare and Medicaid Guide, section 13,915 at page 5673-3.


## Reimbursement for Drugs


44. Padding drug and supply charges would increase the hospital's reimbursement for both pass through costs and Part B costs.

## DOUBLE BILLING OF RADIOLOGY SERVICES

45.  It believed that during the 60's radiologists would work for hospitals on a percentage basis.  When the U. S. Treasury would be billed by the hospital for Medicare and Medicaid services that bill would include the services of the radiologist.  From time to time, from community to community, from state to state, the hospitals would agree that the radiologists would bill for Medicare and Medicaid directly.  When this happened the hospital would generally not reduce its charges proportionately and would continue to bill for the services of the radiologist who was no longer on the payroll and who was billing for his own services separately.  This resulted in double billing and this was widespread nationwide.

46.  During 1979  Dr.  Maxwell entered into an agreement with the Helena Hospital of Helena Arkansas whereby he would perform radiology services at said hospital based on a commission of 30% of the gross revenues from the Department of Radiology. Under this agreement, the hospital would bill for all of the radiology services and this billing included Medicare and Medicaid.

47.  During the year 1981 Dr. Maxwell's contract with the Helena Hospital was not renewed.  During this time it is believed that the Helena Hospital would have private radiologists perform

18

its radiology services. It is believed that these private radiologists would bill for their services, but the Helena Hospital continued to bill for the radiology services as if it were performing these radiology services through its in-house radiologist; i.e., Dr. Maxwell.

48. It is believed that there was a period of time from when Dr. Maxwell was terminated until the hospital hired a new radiologist when there was double billing of radiology services at the Helena Hospital. During this time the Helena Hospital was managed by the defendants QUORUM, Management and/or HCA. The radiologist who followed Dr. J. Watson Maxwell was Dr. Bernard Kordan.

49. The Controller for the HCA hospital located in Carthage, Tennessee; i.e., Smith County Hospital, told Dr. Maxwell that when their radiologist was dropped the hospital actually raised the charge structure.

50. It is believed that the Helena Hospital radiologist has billed Medicare for radiology services not performed.

51. It is believed that the Hospital's billing for the technical component would be a mirror image of the radiologist's billing of the professional component. The radiologist is under a contract with the Hospital wherein he bills for his own fee.

52. There was a period of time during which most if not

all radiology services performed at the HCA North Monroe Hospital were performed by a certain group of radiologists.

53.  It is believed that  originally the radiologists had an agreement whereby HCA billed for their "p".   Their agreement was later changed at HCA's urging whereby  they billed Medicare direct for their "p".

54.  It is believed that HCA  North  Monroe was double billing Medicare for "p's" as to inpatients and outpatients after they changed their contract with the radiologists.

55.  It is known that the radiologist and the Hospital both billed a workman's compensation carrier  a "p" for reading the same bone scan.

### DOUBLE BILLING FOR EKG's

56.  Dr. Mark Robirds was a staff physician at the Helena Hospital through sometime in 1991.   Dr. Francis Patton remembers that when Dr. Robirds was there the Hospital  double billed some EKG's in the Medicare and Medicaid area.

57.   There was a time when one group of physicians performed cardiology services and read EKG's at HCA North Monroe Hospital.

58.   These doctors would get information from HCA so they could bill for the "p".  If these doctors were not billing their "p" under Part B they would not need this information.

59.   It is known that during this time "p"s for EKG's were being improperly added to Part A bills at HCA North Monroe.  Two HCA North Monroe employees stated that this was being done  and it was a mistake because they should have billed it on Part B. EKG "p"s were being billed by the Hospital for these cardiologists, all of whom were also billing  their own "p"s at that time.

## DOUBLE BILLING PATHOLOGY SERVICES

60.   At one time a certain group of physicians performed pathology services at the HCA North Monroe Hospital.

61.   It is believed that The North Monroe hospital double billed Medicare and Medicaid for Pathology services.  Pathologist at the hospital would bill for the interpretation or  the professional component.  The hospital would then bill for the professional component  and also for taking the sample or the technical component.  The Hospital was only suppose to bill for the technical component.

62.   The hospital double billed Medicare and Medicaid for Pathologist services.  One of the pathologists had billed for the

"p" on a Medicare inpatient's Part B bill.  That patient  stated that the Hospital billed Medicare for the same service.  The Hospital was made aware it was double billing pathology services but continued the practice.

63.   At that time the pathologist had an agreement with HCA North Monroe that he would bill Medicare direct  for the "p" pertaining to pathology services rendered at the Hospital.   He and his pathology group were the only providers  performing pathology "p"s at that Hospital at that time.

64.   Quorum and/or HCA is engaging in this same double billing practice at the Helena Regional Medical Center.

65.   Quorum was billing Dr. Patton's "p"s  and then it would remit his portion of the fee to him.  Ultimately, it agreed that he bill his own "p"s.  He had numerous patient complaints that Quorum's  part of the Pathology bill was higher than it was before.   Quorum continued to bill for his "p"s as it had done before the new agreement was entered into on August 1, 1992. This resulted in intentional double billing of pathology professional components.

66.  It is believed that the practice of double billing for "p"s is widespread throughout all hospitals owned or managed by Defendants.

Hospital will also bill a "p" under Part B.   This is double billing of the "p" and may even be triple billing if Medicare is not suppose to pay for the ER doctors reading of the x-ray.

### INAPPROPRIATE ADMISSIONS THROUGH THE EMERGENCY ROOM

71. It is believes that the ER doctors were paid $60.00 per hour plus a percentage of the billing at HCA North Monroe.   At HCA North Monroe a lot of the ER admissions are inappropriate. An HCA North Monroe Employee stated that there was nothing that could be done about inappropriate ER admissions of Medicare patients since the ER doctors are paid a commisssion for every patient admitted.   They admitted nearly every Medicare patient coming through the ER door.

72. As discussed hereinabove it is contrary to Medicare rules and regulations to pay a doctor for an admission, but the ER patients were, in effect, admitted in exchange for a commission.   HCA tried to disguise this by giving certain doctors positions with the Hospital as "Admissions Directors" or as   the "Director of Quality Assurance".

24

## IMPROPERLY CLAIMING DISPROPORTIONATE SHARE
## PAYMENTS UNDER THE MEDICARE PROGRAM

73.  Prior to 1988 the North Monroe Hospital contracted with private physicians to provide dialysis services to the Hospital's renal patients.  In 1986 the Hospital acquired its own dialysis unit.  In 1986 the St. Francis Hospital in Monroe Louisiana closed its dialysis unit so HCA Monroe got all of the Renal patients.  At that time HCA North Monroe only had  30 beds but it had  5-7  renal  patients  so  it  probably  qualified  for disproportionate share that year.  HCA North Monroe then went to 115 beds  and  even  later  to  150 beds.   The  population  of legitimate  renal  patients  did  not  grow  in  proportion  to  the Hospital.  The number of renal patients stayed the same  but the Hospital grew  so  it  did  not  qualify  for  disproportional  share after the first year.

74.  The Hospital Administrator was jumping for joy when he learned  that,  if,  Medicare  patients  who  have  renal  trouble amounted to a certain percentage of the diagnosis for all of the Medicare patients seen by the hospital that year, the Medicare program would pay the Hospital additional money for these "renal patients".  They were,  theoretically,  more  expensive  for  the Hospital to manage.  This was called the disproportionate share payment.  The Hospital gets an extra $350.00 per day for these renal patients as the disproportionate share payment.

75. The only renal patients who qualify for disproportionate share are end stage and they must amount to 10% of the Medicare patients in the Hospital excluding discharges classified into DRG No. 302 (Kidney Transplant), DRG No. 316 (Renal Failure), or DRG No. 317 (Admit For Renal Dialysis). The North Monroe Hospital did not have enough end stage renal patients to qualify for disproportionate share after the first year.

76. The way it claimed qualification, was to go back through three years of patient records and count any patient who had any sort of renal diagnosis even if it was a minor or a secondary diagnosis. They would improperly count, for example, a heart patient with a urinary tract infection as a secondary diagnosis. A patient with any renal diagnosis whatsoever would be counted. The Hospital Administrator went back through all of the Medicare patient's records and had many diagnoses rearranged so that they would fit in the renal category that would qualify the Hospital to receive this additional disproportionate share money. It is believed that the doctor making the original diagnosis was not consulted.

77. This was a double impropriety: first; to meet the disproportionate share threshold and second; receiving $350.00 per day for patients who did not qualify.

78.   The North Monroe Hospital   was an HCA hospital during the time it was claiming to be a disproportionate share hospital.

## KICKBACKS FROM PHARMACEUTICAL COMPANIES AND SUBSEQUENT BILLING FOR DRUGS WHICH DID NOT COST THE HOSPITAL ANYTHING

79.   Pharmaceutical companies would give the North Monroe Hospitals drugs free of charge if they bought certain drugs at a previously agreed price.   This, in effect, amounted to a kickback from the pharmaceutical company to the hospital.

80.   The pharmacy department at North Monroe was double billing.   Administration gave the Pharmacy Director a pat on the back for making very high profits in one quarter.

81.   It was routine procedure to double bill pharmacy charges at HCA North Monroe.   This would   cause the Hospital to be   improperly   reimbursed   by   Medicare,   especially,   for outpatients.

## KICKBACKS TO DOCTORS WHO PUT MEDICARE AND MEDICAID PATIENTS IN HCA HOSPITALS

82.   The way HCA operates so profitably is by getting its financial hooks in doctors in the community.   This is done through "physician recruitment".   If the doctor plays ball with HCA he will reap financial rewards.   The doctors get nice

offices, equipment, office managers, nurses and even guaranteed income.

83. The North Monroe Hospital would guarantee various doctors income. The procedure which the Hospital uses violates the physician recruitment rules and regulations published by the IRS and Medicare. The Medicare patients of these doctors are placed in the Hospital and thereby the anti-kickback provision of the Medicare statutes and regulations discussed hereinabove are violated.

84. It is believed that the Helena Hospital would pay doctors to come there and practice medicine. It is believed that one doctor was guaranteed $10,000 a month net income above expenses. An OB/GYN, had a two year contract where he was guaranteed a lot of money for two years.

The OB/GYN had a high volume of Medicare and Medicaid patients. These patients are placed in the hospital. It is believed that this situation results in double billing where the hospital billed Medicare or Medicaid for a service and the doctor will also billed for the same service. It is believed his practice is widespread throughout the HCA/Columbia or Quorum system. It is believed that this has occurred at the Dumas Arkansas Hospital and the Helena Arkansas Hospital, both of which are managed by QUORUM, HCA, and/or Columbia.

28

## PERFORMING UNNECESSARY FRACS OF ENZYMES IN MEDICARE PATIENTS

85.   All muscles put out different enzymes if they are damaged.  A SMAC 20 is a legitimate test that shows if enzymes such as LDH and CPK are elevated.  If these enzymes are elevated then you do a FRAC.  A FRAC breaks it down and shows where the elevated enzymes come from, such as the heart.  86.  The   "t" for a FRAC was around  $108.00.  The "p" was $60.00.  The "t" for a SMAC 20 was around $75.00.

87.  HCA North Monroe  was FRAC'ing enzymes unnecessarily. They were doing FRACs every day even after the enzymes had peaked when it was unnecessary to do more than three FRACs.   They were doing FRAC's when they knew there were no heart enzymes at issue.

88.  The Pathologist would be paid under Part B for his "p's" and if the Hospital was double billing it would also get a "p" under Part B for these unnecesary FRACs.  Even if there was no double billing the Hospital was receiving a "t" for the unnecessary FRACs.  The pathologists were billing for their "p's" themselves at that time.  In addition, most of the  outliers patients were renal patients so this would also increase the Medicare outlier payments.

**PERFORMING UNNECESSARY ANEMIA SURVEYS ON MEDICARE PATIENTS**

89.   When a CBC shows that the hemoglobin and hematocrit are low (i.e. the patient is anemic) that a doctor should order one anemia survey to determine where the low blood comes from. All renal patient have some anemia.  The anemia survey should be done on a renal patients before the patient gets new blood during dialysis.  The anemia survey should not be done after the patient gets new blood.

90.  Hemoglobin and hematocrit show how well a renal patient holds new blood received pursuant to dialysis.  This information can be gained by either an anemia survey or a CBC. The body replaces blood every 48 hours but a renal patient gets new blood every three days.  It is necessary to test the blood produced by the patient not the blood just put into the patient pursuant to dialysis.

91.  HCA North Monroe was doing unnecessary anemia surveys on renal patients every day.

92.  Medicare was paying for unnecessary anemia surveys.


**IMPROPERLY  CHANGING DIAGNOSIS TO ENHANCE MEDICARE BILLING**

93.  The North Monroe Hospital had a computer programmed to evaluate the patients symptoms which would tell the Hospital

which diagnosis would allow for the maximum amount of Medicare billing.

94.   The computer was a DRG finder or encoder. DRG numbers are associated with each diagnosis and indicate the amount payable under Medicare for certain inpatient services. The patients records could be programed into the computer and it would tell you how to rearrange the diagnosis to maximize the Medicare bill.   For example, if there was a diagnosis of pneumonia and a sputum culture had been done the computer would tell you to change the diagnosis to bacterial or yellow pneumonia which would enhance the Medicare bill.   This was probably legal if the doctor would attest, in writing, to the change in diagnosis as was   required by law. The law required that the doctor list all diagnosis and principal diagnosis and attest in writing that this was correct.

95.   The Hospital Administration wanted to have a 24 hour turn around from when the patient was discharged until the Medicare bill was sent.   There was no legitimate reason for this other than to make the administrator look good to HCA corporate. This could not be done legitimately because the doctors did not dictate their summaries stating the diagnosis   within 24 hours. Hospital Employees were expected to render the complete bill stating a diagnosis from the computer before the doctor even made known the diagnosis.   The Administration assigned this task to

31

the   Medical Records Department after Mrs. Rappaport objected to this procedure.

96.   It is believed that Medical Records engaged in  this improper  billing procedure.    The doctor's chart would not correspond with the bill sent to Medicare for payment.   Bills were  sent  before  and  after  the  doctor  did  his  diagnosis. Sometimes the doctor would sign and sometimes doctors did not sign the medical records attesting to the diagnosis.  A Hospital employee would sign the doctors name herself to the attestation. Sometimes the bill would go out with no attestation.   From the discussion hereinabove under "Attestation" we can see that this is all improper.

97.   The administration was so pleased with the improper way Medical Records was billing that it gave them a case of beer.

98.   This improper billing procedure caused HCA North Monroe to receive improper Medicare reimbursements.

**PADDING PART A BILLS RESULTING IN HIGHER MEDICARE PAYMENTS**

99.   Part A bills were padded in the following ways by HCA North Monroe: (A) Excluded services such as "p's" for EKG's, ER services and respiratory services were  added to the bill; (B) Items  were  charged  to  the  bill  that  were  not  ordered  or

delivered; and (C) There was padding of pharmacy charges, Lab charges (pathology), and charges from Central Supply.

100. A review of Part A bills would show that pharmacy charges constitute close to 50% of the total bill.  There was massive double billing of pharmacy charges at this Hospital.

101.  It is believed that a high percentage of all Part A bills are padded by HCA in some way.  This was brought to the attention of the Hospital Administrator.  He said "Leave it alone because we get to write this off our taxes at the end of the year."

102. Padding of Part A bills has occurred in other  HCA Hospitals.

103. Padding the Medicare Part A bill causes improper Medicare reimbursement.

## PADDING THE PART A BILL TO ENHANCE THE INCOME OF SCH'S

104.   It is believed that the Helena hospital was a SCH. It is believed that Helena is reimbursed at the urban rate even though it is a rural hospital. Helena may have qualified by establishing itself as a SCH and by showing it had costs justifying the higher urban rates.   Urban DRGs are higher than rural DRG's. If it padded Medicare patient bills to achieve this status then it has improperly been reimbursed by Medicare.

## UNBUNDLING OR CODE SPLITTING

105. Sometimes  Medicare will have one code that will cover several tests or those tests can be broken down into their various parts and billed separately under several different codes.  When several different codes are used this enhances the Medicare bill and is called unbundling.  HCA  recommended that several of its hospitals unbundle in order to enhance Medicare payment.  This results in improper Medicare payment.

## HCA PREFERRED VENDORS

106. HCA/Columbia  and/or  Quorum  have  a  long  list  of preferred vendors which they primarily do business with.  They supposedly get discounts or kickbacks from these vendors which are not reflected in the cost reports.  HCA and Quorum will only do business with  their preferred vendors who usually charge more for goods and services than  HCA or Quorum  would pay any one else.  Apparently Medicare reimbursement is inflated by purchasing at higher prices from preferred vendors.  However, HCA and Quorum  pocket additional profits under the table and outside the cost reports in the form of  "discounts", rebates or kickbacks.  These prefered vendors; are either partly or wholly owned by HCA; or are joint venture partners of HCA, Columbia

34

and/or Quorum.    A scheme such as this has been perpetrated concerning Clinitron beds.

## IMPROPER BILLING UNDER THE HOME HEALTH CARE PROGRAM

107.   The Home Health Care Program of the Helena Hospital and the Dumas Hospital has been padded.  Home Health Care is on a cost basis and the hospitals were charging items to Home Health which would be reimbursed by Medicare but  were not proper expenditures under Home Health or which were expenditures for other areas of the hospitals.

108.   In Finance Committee meetings of the board of the Helena Hospital discussions were had as to different ways to pad the Home Health bill or improperly bill Medicare through the Home Health program.

109. A fraud against Medicare was intentionally planned and carried out.  Regional Vice Presidents of QUORUM and/or HCA would attend these meetings and were aware of this intentional and willful fraud perpetrated against Medicare through the Home Health Care Program.  Home Health Care was routinely billed for items that were not expended on Home Health Care.

110. The QUORUM, Columbia and/or HCA fee for managing the Helena Hospital was based on reimbursement and they even got a

bonus when Medicare reimbursements increased a certain percentage.

111. Quorum kept two sets of books; one to show the board, and a set of real books. It is believed that Medicare Auditors would use financial statements that were phony. QUORUM would also receive its bonuses bases on the phony records that were shown to the board of directors.

112. The Dumas Hospital placed an ad for hiring nurses for the entire hospital. Home Health was listed as one of the departments for which there was hiring. The Controller billed the entire ad to Home Health. The salary of a biller at the Dumas hospital was paid by Home Health and the Hospital Business Office. At the time this was legitimate. Later Home Health hired a second biller and the first biller ceased doing any work for Home Health. The Director of Home Health said Home Health should not be paying the first Biller's salary. The Controller said "do it anyway".

113. The Dumas Ultra Sound Department needed a high tech VCR. The Director of Home Health and Radiology discussed letting Home Health buy the high tech VCR for $1,500.00 to $2,000.00 and swapping for the old VCR currently being used by Radiology.

114. It is believed that Dumas bills Medicare for all of the Home Health visits ordered on the patient's chart but that they are not all being performed. It is physically impossible for the

Home Health staff to make all of the visits Medicare is being billed for.

115. The Dumas is charging Home Health for 1/3 of the square footage in its building when home Health only uses only one sixth of it.   One hundred percent of the office, salary, supplies and travel expenses of Delta Memorial's Gerioentologist  has been biiled to Home Health even though she did no work for Home Health.    Recently the Gerioentologist started doing a small amount of work for Home Health but it still pays all of her salary and expenses.

116. During the past three years Dumas has charged a lot of furniture and equipment to Home Health that was not used by Home Health.   Once this improper practice 'started   Dumas stopped maintainig an inventory log.

### MEDICARE IMPROPRIETIES CONCERNING GEROPSYCHIATRIC UNITS

117. It is believed that geriatric patients (who are nearly all Medicare patients) are being placed in psychiatric wards by the hospitals run by QUORUM, Columbia and/or HCA when they  could be returned to nursing homes where the cost of maintaining them would be much less.  Diagnoses are rendered as to these patients so that they can be placed in psychiatric wards wherein Medicare

billing is greatly enhanced.   Many of these patients do not need to be in psychiatric wards.

118. QUORUM has a program wherein a contractor which is close to it builds psychiatric units at many of the hospitals which QUORUM manages.   These units, in many cases, will be limited to Medicare patients which may be a violation in itself. See the Medicare and Medicaid Guide, section 412.25.   Most of these Medicare patients may have some psychological defect as most older people do, but it is probably unnecessary to put all of them in psychiatric wards.

119.   Quorum has hired a consulting company, Cornerstone Health Management Company, to install Geropsychiatric  Units (GP Units) in its hospitals.

120. The GP Unit would be 100% Medicare.   The occupancy would be artificially held down to 50% the first year with only a 10%  increase for each of the next five years up to 90% in the fifth year.

121.   Similar to Home Health  GP is on a cost basis.   The payments in the second year are based on the costs per GP Unit established in the first year.  This is why they only want a 50% occupancy the  first year so they can artificially drive the per unit cost up.   The third year payments are based on the per unit cost established in the second year and so on.   There is a stair step effect with costs going down each year but with each year's

payment being based on the preceeding year's inflated per unit cost.

122. This program is being implemented at the Dumas Hospital now. Quorum has hired a consulting company, Cornerstone Health Management Company, to install Geropsychiatric Units (GP Units) in all of its hospitals. Cornerstone's Vice President of Operations, Clay Deerdorf made a presentation to the Dumas Board and Medical Staff. He stated: (A) The GP Unit would be 100% Medicare. (B) The occupancy would be artificially held down to 50% the first year with only a 10% increase for each of the next five years up to 90% in the fifth year. (C) He constantly emphasized that they were violating no Medicare rules and it was all perfectly legal, as if he was trying to cover up some illegallity. (D) They were putting other such units in other Quorum hospitals. (E) The GP unit would make a lot of money for the hospital.

123. Using the criterion they have established they could fill the Unit up the first year.

124. There is also a padding of the cost basis just as there is in the Home Health program.

125. The Unit's psychiatrist gets a $5,000.00 per month stipend plus he bills Medicare himslf under Part B for his "p's". He also has a private practice. Ostensibly, he is paid the $5,000.00 as the unit's Medical Director. Since the $5,000.00

39

is part of the units cost basis Medicare is paying twice for his services.

126. They are buying things for the GP Unit which are not used exclusively for it but with no proration of cost with the hospital.  Once the State of Arkansas had inspected the Unit they moved the bed out of one of the rooms and converted it into an office.  The phone outlet was covered during inspection.

127. Since they are only using five of the ten units the first year they are claiming excessive square footage as part of their cost.

128. It is believed that the average length of stay will be 15 days and that these patients do not really need to be there. Medicare will pay $650.00 per day as an interim payment until they get their interim cost report done.  Then payment is based on the cost report with payment in subsequent years being based on the cost report of the previous year.

129. Cornerstone is a Quorum prefered provider.  Cornerstone gets a management fee which involves the salary of the Program Director, Activities Director and Clinical Psychologist. However, this may have been modified so that some or all of these are on the Hospital payroll.

130. The Hospital also get a TEFRA payment which is some sort of incentive based on cost reports.  To get higher TEFRA payments It is believe they limit their occupancy.

131. By limiting the GP units to Medicare patients only and by artificially limiting the occupancy to inflate the costs the Defendants are receiving improper Medicare reimbursemnet.

## MISCELLANEOUS ALLEGATIONS

132. The defendants knowingly submitted records to various governmental employees, agents, entities, agencies and/or intermediaries which misrepresented existing material facts as to the nature of the amount of reimbursement defendants were entitled to receive under the Medicare and/or Medicaid programs. The United States Government acting through its agents, officers, employees, agencies and/or intermediaries reasonably and justifiably relied on the misrepresentations contained in these false records or reports. As a proximate result of having relied on these misrepresentations, the United States Government through its agencies, agents, officers, employees and/or intermediaries incurred damages when it paid Medicare and/or Medicaid benefits to the Defendants that greatly exceeded the amounts which the Defendants were entitled to receive.

133. It is believed that the Defendants have submitted many thousands of false claims to officers, employees or intermediaries of the United States Government for which they have been improperly and illegally paid.

41

134. The defendants did not furnish officials of the United States responsible for investigating false claims violations with all information known to such defendants about the violations within 30 days after the date on which the defendants first obtained the information and at a time when no criminal prosecution, civil action, or administrative action had been commenced under the Federal False Claims Act with respect to such violations and at a time when the Defendants did not have actual knowledge of the existence of an investigation into such violations.   Defendants have not fully cooperated with any government investigation of the violations   made the   basis of this complaint.

135. A copy of this complaint and written disclosure of substantially all material evidence and information which the qui tam plaintiffs possess has been served on the government pursuant to rule 4(d)(4) of the Federal Rules of Civil Procedure.   This complaint has been filed in camera and shall remain under seal for at least 60 days and shall not be served on any defendant until so ordered by the court.

136. None of the Qui Tam plaintiffs herein have come into possession of evidence or knowledge of any of the allegations or transactions alleged herein as a result of the public disclosure of said allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative,

Government Accounting Office report, hearing, audit, or investigation, or from the news media. The Qui Tam Plaintiffs alleged herein are the original source of the information alleged and made the basis of the allegations of this complaint. The Qui Tam Plaintiffs are individuals who have direct independent knowledge of the information on which the allegations of this complaint are based and have voluntarily provided the information to the government before filing this action which is based upon said information.

## COUNT I

137. The allegations of paragraphs 1-111 hereinabove are realleged under Count I and incorporated hereunder by reference.

138. The Defendants knowingly presented or caused to be presented to officers or employees of the United States Government false or fraudulent claims for payment or approval.

139. The Defendants knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the government.

140. The Defendants conspired to defraud the government by getting false or fraudulent claims allowed or paid.

43

141. With respect to the information made the basis of the false records, statements, claims or reports alleged herein the Defendants had actual knowledge of the information.

142. **WHEREFORE**, as a proximate result of the false claims, records and reports submitted by the Defendants to the United States Government the United States Government has been damaged and the Plaintiffs seek a judgment against the Defendants for:

a.   An amount between $5,000 and $10,000 to be determined by the court and/or the jury for each individual false claim which is made a basis of this law suit.

b.   Three times the amount of damages which the government has sustained because of the acts of the defendants in submitting the false claims which are made the basis of this law suit.

c.   Costs

d.   Attorney's fees

### COUNT II

143. The allegations of paragraphs 1 through 111 hereinabove are realleged under Count II and incorporated hereunder by reference.

144. With respect to the information which is made a basis of the false claims, records or reports alleged herein the

Defendants acted in deliberate ignorance of the truth or falsity of the information.

145. **WHEREFORE**, as a proximate result of the false claims, records and reports submitted by the Defendants to the United States Government the United States Government has been damaged and the Plaintiffs seek a judgment against the Defendants for:

    a.    An amount between $5,000 and $10,000 to be determined by the court and/or the jury for each individual false claim which is made a basis of this law suit.

    b.    Three times the amount of damages which the government has sustained because of the acts of the defendants in submitting the false claims which are made the basis of this law suit.

    c.    Costs

    d.    Attorney's fees

## COUNT III

146. The allegations of paragraphs 1 through 111. hereinabove are realleged under Count III and incorporated hereunder by reference.

147. With respect to the information which was made the basis of the false claims, records and reports alleged herein the

45

Defendants acted in reckless disregard of the truth or falsity of the information.

148. **WHEREFORE**, as a proximate result of the false claims, records and reports submitted by the Defendants to the United States Government the United States Government has been damaged and the Plaintiffs seek a judgment against the Defendants for:

    a.   An amount between $5,000 and $10,000 to be determined by the court and/or the jury for each individual false claim which is made a basis of this law suit.

    b.   Three times the amount of damages which the government has sustained because of the acts of the Defendants in submitting the false claims which are made the basis of this law suit.

    c.   Costs

    d.   Attorney's fees


**THE UNITED STATES GOVERNMENT AND THE QUI TAM PLAINTIFFS DEMAND TRIAL BY A STRUCK JURY AS TO ALL ISSUES ALLEGED IN THIS COMPLAINT WHICH ARE SO TRIABLE**


           Respectfully submitted,

           M. CLAY ALSPAUGH
           Attorney for the Plaintiff
           2323 Second Avenue North
           Birmingham, Alabama  35203
           205-324-5635

**RONALD R. CROOK**
Attorney for the Relator
2323 Second Ave, N.
Birmingham, Alabama  35203
(205) 324-5635

**ROBERT D. WORD, III**
Attorney for the Relator
223 S. Market Street
Scottsboro, Alabama  35768
(256) 259-9606

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Sealed Complaint has been served on: The Honorable G. Douglas Jones, U.S. Attorney for the Northern District of Alabama at 200 Robert S. Vance Federal Building, 1800 5th Ave. N., Birmingham, Alabama 35203 and The Honorable Janet Reno, United States Attorney General, Department of Justice, Office of the Attorney General, 10th St. and Constitution Ave., N. W., Washington, D.C. 20530 and Jonathan Diesenhaus, Attorney, Civil Division U.S. Department of Justice, P.O. Box 261, Ben Franklin Station, Washington, D.C. 20044 on this the 09th day of July, 1999 by causing a copy of the same to be deposited in the United States Mail, postage prepaid.

Ronald R. Crook
One of the Attorneys for the Relators

Since this complaint is filed under seal Defendants are not to be served until service is ordered by the Court.  Once ordered by the Court, serve Defendants as follows:

**HOSPITAL HEALTH GROUP, INC.,** and
**HCA MANAGEMENT COMPANY, INC.,** and
**HCA MANAGEMENT GROUP, INC,** and
**HSP, INC.**
c/o The Corporation Company
60 Commerce St.
Montgomery, Alabama  36104

**HEALTH TRUST, INC. THE HOSPITAL COMPANY**
c/o Prentis Hall
57 Adams Avenue
Montgomery, Alabama  36104

**COLUMBIA/HCA HEALTHCARE CORPORATION**
c/o The Prentis Hall Corporation System, Inc.
500 Tallan Building
Two Union Square
Chattanooga, Tennessee  37402

**HCA HEALTH SERVICES OF LOUISIANA**
c/o Prentis Hall Corporate Systems
203 Carondelet Street, Suite 811
New Orleans, Louisiana  70130